The next case is United States v. Dennis Martin. Thank you. Thank you. Attorney Barth. Good morning, Your Honors. May it please the Court. Michelle Barth on behalf of Appellant Mr. Dennis Martin. There are a number of issues that we raise on appeal. I intend to focus on the suppression issue, the Bruin issue, and the opening statements issue. Beginning first with the suppression issue, I'd like to talk about how the law enforcement's officers' withholding of medical care impacted and should have impacted the Court's voluntariness ruling. Mr. Martin told every officer that he encountered that he was in a sickle cell crisis and needed to be taken to the hospital. At no point did any officer offer to take him to a hospital. He did not receive access to medical care until after he was interrogated by the officers in this case. And once he was released, not released, but taken to the hospital to receive medical care, he remained there for three weeks. So he was in a serious medical crisis at the time that he was interrogated by the officers. Were he, because of their callous treatment of him and because they did not take him to the hospital immediately, his condition worsened? That's absolutely right, Judge Lynch. Which is terrible. But does that affect the voluntariness of the statement is my problem. I listened to the audio, looked at the videos that exist, but the audio is really the thing that tells you the interrogation period. And I must admit, your client sounded to me fine until about 35 to 40 minutes into the interrogation. Now, of course, it's an interesting problem. He should have been taken to the hospital, it seems to me. If he had been taken to the hospital right away, maybe, I don't know what they do to people in this situation, maybe he would have had the same consequences anyway, or maybe they could have, by fast treatment, prevented him from having to be in the hospital for three weeks. But either way, what's the best evidence that the reason he agreed to talk is somehow because his health was impaired, or because he was afraid, or because he thought, if I don't agree to talk, they'll never take me to the hospital? I mean, how do you connect his physical health to his decision? I mean, he knew, because he was told, you could stop this right away. You could refuse to be interviewed. What is the connection between the fact that he wants to be hospitalized and his agreement to talk, rather than to say, no, I don't want to talk, take me to the hospital? So it'll take me a little bit to answer this question, so I'm going to go through it chronologically. The first move that Mr. Martin made was he asked for access to his medication. Right, in the car, all that. Right. Then, fast forward, when he's at the station, when the interrogating officers are present, he says to them, do what you all need to do to me. Just do what you all need to do to me. Just take me to the hospital. And is that the key statement, then? Well, I think we have to look at it, just not that statement. It seems to me, is that not the crux point? Because that's something on which we could hang a decision that he agrees to do whatever they want him to do, in the hope that that will get him to the hospital faster than if he resists doing what they want. I think that's the most explicit statement, but we can also rely on all of the events that led up to that point, which was the refusal of the medication, which obviously you knew about. And also, when he's present with all of the officers, he says, I'm in a sickle cell crisis, take me to the hospital. But what's interesting about this to me is this is not a case like Taylor, I take it. Maybe I'm wrong, but I didn't think your argument was his physical condition impaired his ability to make decisions. Like Taylor, who was sort of half asleep and nodding off, it's that even if this was not the conscious intention of the officers, they kind of leveraged his desperation to go to the hospital to get his consent to talk. That's exactly the interpretation that I take. But the important points I take from Taylor is that medical stress is an important factor that should be taken into account. It's certainly a factor that should be taken into account. Exactly. But factually, it's not a match. And the court's opinion in this regard is devoid of all of these facts which demonstrate that he was in this medical distress. The court does not include in the opinion that he told Officer Acklund that the cold triggers his sickle cell and asked him to shut the door. The order doesn't include that Mr. Martin told him. Right, but what the court does say is pretty much having the reaction that I had listening to it, that understanding that Mr. Martin knew that his condition was going to worsen, that nevertheless, he agrees to talk. And he seems kind of okay when he does that. He doesn't seem clouded. He seems to be making a choice, a bad choice perhaps. But he seems to be just like anybody else who's agreeing to talk when it would have been for any number of reasons in his interest not to do that. Well, Judge Lynch, I would frame that choice as if I want to go to the hospital, I will need to speak. And I don't think that … Why would you think that rather than these guys are never going to take me to the hospital? They didn't. It's not like, oh boy, now that we've got his statement, fine, take him away. Instead, they put him in a cell and his condition worsens and worsens until long after the point where any reasonable person would have said let's take him to the hospital. I don't recall what Officer Roy's exact words to him prior to the administration of the Miranda warnings, but it was something along the lines of we just want to talk to you, Dennis. There's nothing in the record where the officer says, hey, we're going to only take you to the hospital after we're done talking to you. But you don't need to establish that. You don't need to establish that they intentionally leveraged his desire to go to the hospital. The question is what's going on in his head. When you say his head, you're referring to my client. Yes, right. I'm sorry. What's going on in Mr. Martin's head? And again, I'll circle back to what he said explicitly to everyone involved in this case, all of the law enforcement officers. Y'all do what you need to do to me. Just take me to the hospital. My health is more important than anything else here. Just get me to the hospital. Get me to the hospital. Now, the fact that he spoke lucidly and coherently during the interrogation is of no moment because the fact that he was able to do that isn't a test here. It's whether or not his will was overborne. I think based on these circumstances where the keys to the hospital were within law enforcement's control, and that control was not going to be exercised until after he spoke with them. So I don't know if there are any further issues about that particular issue. I did want to touch on a few other issues, but I see I am out of time. Well, you might, you know, I don't know if you're fully aware of the way this court operates, but the Second Amendment issue, by the time this court gets to it, we will probably have to ask you for supplemental briefing based on whatever the other panels that have precedence over us decide with respect to a whole range of felon and possession cases from clearly violent prior felonies to clearly nonviolent prior felonies. And they all have to be resolved before we get to this one. So it may not be a very productive use of your time, regardless, I mean, if you want to argue it. No, Your Honor. I am happy to move on to the next argument, if that is. I did want to touch on the opening statement that I made in this case. All of the facts that were recited during my opening statement were undoubtedly admissible and related to the voluntariness of my client's statement. Yeah. I wonder about this, though. I mean, I hear your point about this sort of door-opening doctrine that relates to inadmissible evidence being allowed to come in if there is inadmissible evidence on the other side. But it seems to me there is a different sense of door-opening, isn't there? I mean, none of the evidence here that you are objecting to is categorically inadmissible. It is admissible for some purposes under some circumstances and inadmissible for other purposes under all circumstances and even for purposes for which it might be admissible. Maybe it is not admissible based on appropriative prejudice balancing and based on evolving events over the trial. That is how judges make these decisions all the time. So at point A, before anybody opens, it seems to me that Judge Rice was perfectly entitled to decide, oh, this stuff is never going to come up. And then it turns out it does come up because it perfectly legitimately used the fact of the SWAT team entirely within your rights to do so, the fact of the SWAT team as an indication of why your client acted in certain ways at certain times. And once that happens, then we are no longer in a world where the whole idea of why there is a SWAT team there is going to be irrelevant because there is never going to be an issue about the SWAT team. Now the SWAT team is front and center. So I don't know if I call that opening the door so much as that at T2, after the opening, the judge looks at what is relevant and what possible other kinds of prejudice or other kinds of misleading emotional responses a jury could have and makes a different decision than was made at T1. You're perfectly entitled to argue, and that would be a bad decision and an abuse of discretion. But why isn't that the structure of how we should look at this? Well, one, Your Honor, when we're looking at what I said about the law enforcement response during his arrest, what I was focused on, and as you noted, that this is admissible on the voluntariness issue, I don't think that it created a misimpression in some manner. No, you didn't create a misimpression any more than the government is going to say, oh, we didn't want to create a misimpression that Mr. Martin was a bad guy. We're just wanting to put this evidence in for purposes of showing that he had knowledge of his status. That's the only reason we want it in, and we're going to consent to a limiting instruction for the judge to say that's the only thing you can consider it. And you're going to say, in response to that, that the prejudice is sort of inherent because the jury could have an emotional reaction to those facts. It seems to me the government is saying the same thing about your opening. It's not that you are doing something wrong. You are offering this argument about the SWAT team for a limited purpose. You would undoubtedly consent to a limiting instruction that the judge would say, oh, don't ever think that this is admitted in order to make you think the government overreacted or did something terrible. Of course you'd accept that limiting instruction just as they accept the limiting instruction, but the judge still has to contend with what irrational things might the jury be thinking once this is in the case. I guess from my perspective, Your Honor, I don't see why jurors would think anything different because he was charged as a felon in possession of a firearm. So they're going to execute a warrant for an armed felon, which is inherently the kind of thing that you would expect there would be a large law enforcement presence. What the government did here was take it a step too far because they didn't just bring in sort of milquetoast evidence. What they brought in was the fact that they were looking for a machete, which is kind of a shocking fact. And in addition to that, that... A machete is more shocking than a firearm? To me, in some ways, yes, Your Honor. But they didn't bring out that in a prior occasion that machete was used to slice the intended victim, correct? They didn't bring that out. They could have brought out the evidence that they were looking for a machete and the factual circumstances that led to looking for the machete, that it had been used in the past to assault the victim. I don't think that... Well, I can't say for certain... Well, that would have been worse, correct? You know, they just said a gun and a machete. They didn't put all they could have put around that machete. I suppose. But I think the district court would not have let that evidence in anyway because the machete and the injury that the victim allegedly suffered happened outside the range of the firearm possession. But they were going there because he sent a message to her mother that he was going to kill her, correct? And they didn't use that either? Well, just because the district court told them that they couldn't use it. Yes, of course. It's not a question of is the government being neat and restrained and whatever. It's a question of did the judge make reasonable decisions to slice the evidence in certain ways, not with a machete, but with a scalpel, to say this kind of thing comes in, this kind of stuff comes out, here's how much you can do in this vein and here's how much you can't do. And that's the kind of decision that trial judges make all the time. I understand. I maintain the argument that this sort of evidence was inherited. It goes too far. Compared to the charge itself and the fact that the jury had already heard that he's a felon who is armed. And with that, I submit. I didn't touch on the other issues, but I submit on the arguments set forth in the briefs. Thank you. Thank you, counsel. You've reserved your two minutes for rebuttal. Good morning, Your Honor. Good morning. I'm Assistant United States Attorney John Opart. I'm representing the United States. I want to start with Judge Lynch, some of what you were talking about in relation to the voluntariness issue with the suppression ruling. Judge Lynch, you stated that Mr. Martin should have been taken to the hospital right away. And we don't know whether or not he would have the same consequences. Speak right up, counsel. You're hard to hear. I apologize. Mr. Martin, everyone agrees, had the intent to go to the hospital. But he was not going there right away. The record's clear that he did not call for an ambulance. He wasn't ripped out of an ambulance by a tactical team. He was taken out of a car in a vehicle stop. He called a friend with no medical training whatsoever to come pick him up, bring him to get some lunch, and to go to the hospital. It was undisputed. That fact pattern is very different than the one that the defense portrays in its brief. Mr. Martin had these occurrences regularly. There's evidence submitted at trial from defense witnesses that this was a regular problem for him, and he would stay in the hospital for weeks when he'd have a sickle cell outbreak. Mr. Martin's testimony at trial is also insightful as to whether or not his will was overborne, and this court should look at that. Mr. Martin admits on cross-examination during trial testimony he chose when to lie during the interrogation. How can someone's will be overborne when they can still choose to lie? This court isn't stuck looking at the record of the district court at the suppression hearing. You're tasked with determining, in addition to whether or not the suppression ruling was correct, whether the error of allowing the confession, excuse me, the false exculpatory statements from the interrogation was error, and if it was, harmless error. It was harmless error when you look at it through the lens of the trial evidence itself. I want to ask you about the Bruin issue. Are you still claiming that that issue was not preserved when, in fact, because of the issue that the motion to dismiss was filed beyond the time limit, but the court nonetheless addressed it, and it was raised again by the defendant at the end of the trial. Are you still claiming that that issue, you know, has not been preserved in its plain error review? Your Honor, we're actually not arguing it's plain error, that it's been waived. This court's precedent is that a suppression, a Rule 12 motion, such as a suppression motion, not filed prior to trial and filed out of time without good cause being shown is fully waived. Let me ask you, you may be aware of the long queue of cases that we have. I think last time I checked it may be 12 or 13. We would love to see it. Ahead of this one. Is there any particular case that the government, and I'll ask defense on rebuttal, believes in that queue is most similar to the underlying offense in this case? I apologize, Your Honor. I'm not familiar with all those other cases. With the list. Okay. I just thought I'd ask. I do. The interesting thing about this one is, you know, there are going to be some interesting questions. I suppose it's possible that a panel could say that there's no Second Amendment problem with the felon in possession law, period, full stop, end of story. The first one in the queue is about a clearly nonviolent felony. There's no violence in the case. It's a financial fraud. So that may be the strongest case for an as-applied Second Amendment challenge. Then there are cases in the queue that are clearly violent felonies, and, you know, so if the first case goes as applied, it's unconstitutional, then it might be found constitutional as applied to violent felonies. Narcotics felonies are the neat case that is not categorically violent, may not be violent at all in terms of the underlying facts of the particular narcotics case, but is something that Congress seems to think gets bracketed with violent crimes all the time. And so it might present more of a problematic case for the Supreme Court than other nonviolent felonies. But I don't know if there's another narcotics felony in the queue. I don't know that either. You don't know that either. But this is the sort of range of issues that this Court is going to have to deal with over time. Yes, but I think, you know, in Rahimi, the Supreme Court is clear that these types of categorical decisions are presumptively lawful, was the language of the Chief Justice. So I do think that's my hope is at this time. Well, that's as may be in terms of the merits of the argument that I don't think we're in a position to worry about too much now as this panel with this case. But the issue that Judge Kahn raises is a serious one because I suppose we could avoid the Second Amendment here and decide these other issues and get to them. After all, if Ms. Barth is correct, there might be serious problems with this conviction. And to wait for months to get it dealt with may be unattractive. But anyway, it strikes me as a difficult position to say there's no good cause for a lawyer not to immediately recognize that a criminal statute that has been on the books for quite a while has been applied routinely in which thousands of people have gone to prison without a murmur from the Supreme Court has been unconstitutional from the beginning under the Second Amendment. Simply because the Supreme Court, in a complex series of opinions spanning hundreds of pages and dealing with all kinds of arcane historical stuff, concluded that a licensing regime that requires showing good cause for possession of, or license to possess a firearm and carry a firearm, is unconstitutional. That seems asking an awful lot of defense counsel in routine felon and possession cases to come to the realization that, oh my God, these people might actually be prepared to say that it's open season for felons possessing firearms now and make a motion to dismiss in the time provided for motions to dismiss an indictment, rather than taking the time to read it and study it and bring it up when it's still well before trial, bring it up again at the end of the trial. The judge didn't think, oh, I shouldn't be considering this. The judge thought I should consider this and ruled on it. Your Honor, Judge Rice twice denied it as untimely. Oh, that's right. But she then went on and talked about the merits. She did. She did. So why are we debarred from reviewing it? Well, the court's precedent says that an untimely motion is procedurally defaulted. We can disregard the waiver, can't we? We can find good cause. Well, my understanding is that this court was used to do. We're spending a whole lot of time on an issue that you're not going to go above for two months. I agree. So why don't you go on to the rest of your argument? Thank you, Your Honor. I do want to address the opening argument issue. But before I move to that, I just want to emphasize that this is a totality of the circumstances analysis for the post-arrest interview circumstances. There is no medical evidence whatsoever in the record as to what Mr. Martin's physical condition would have been at the time. There is evidence that shows it progressively worsened over that time frame. Forty minutes into the interview, when it concludes, he is in a different state of mind. The government doesn't dispute that. However, this court is tasked with looking at his voluntariness throughout that interview. And the portions the government used are early in the interview in relation to the firearm false exculpatory statements. I want to talk briefly about the opening argument. The defense cites Rhea, this court's opinion, for basically being the penultimate example of curative admissibility. And Judge Lynch, you talked about the idea of categorically inadmissible evidence. That is Rhea. Rhea attempted to admit into evidence his own statements because the government had already admitted some of his statements as admissions of a party opponent under the hearsay rules. They're categorically inadmissible. A defendant can't admit his own exculpatory statements through the government, quote, opening the door to admissibility through proper use of the hearsay exceptions. So Rhea is really in a positive. As Judge Lynch, as you stated, this is a different type of opening the door. And Judge Rice did have concerns about misimpressions that Ms. Barth put before the jury because she told the jury he was being arrested for being a felon in possession in 2019. That is inaccurate. He was being arrested for attempted murder in 2019. The SWAT team that was present was not present for a Vermonter with a hunting rifle who happened to be a felon. He was present for an arrest of an attempted murder suspect who was alleged to have brutally assaulted his wife with a machete. That police presence was appropriate given that context. Why law enforcement was concerned about their own safety in executing those warrants. One quick factual question. Mr. Martin is no longer in prison. Mr. Martin has been released. I believe he's in immigration custody. OK. Thank you, counsel. Attorney Barth, you had reserved two minutes for rebuttal. You may take your full two minutes. Thank you, Your Honor. You had asked earlier which case on the list that we think most closely matches. And I don't know the answer to that question either. Other than Judge Lynch, you had mentioned the first one was financial crimes and nonviolent. And for Mr. Martin, he would, I think, be in the nonviolent category. The Ninth Circuit has looked at that in the drug context in Duarte. They may have backed away from that after Rahimi. I don't remember for sure as we stand here right now. But I think that the case that is most instructive on this particular conviction is United States v. Quails. It's cited in both the opening brief and in the reply brief. It's a district court out of Pennsylvania. As the court may recall, Mr. Martin's underlying conviction is in Pennsylvania. And this district court examined precisely the same statute and found that the government failed in its burden in establishing a historical tradition and does so in a pretty detailed manner. What he pled to was count one of the original charge, right? Manufacture, deliver your possession with intent to manufacture, deliver narcotics. It is. I don't remember. That sounds right to me, but I don't have it in front of me. It's in the opening brief and also in the reply brief as well. Initially, my colleague across the board suggested that the fact that Mr. Martin has suffered from this chronic illness since he was a child somehow diminishes the amount of pain that he was in at the time. Said something about him stopping for lunch and not calling for an ambulance. Sometimes when a person suffers from an illness and sort of knows how it is managed, you don't call for an ambulance when you have this kind of chronic illness in your life. And stopping for food on the way to the hospital was something that I believe he explained during trial, saying he just doesn't like the food at the hospital and wanted to get something to eat before he got there. So I don't think that those facts diminish our argument in any way. The Bruin issue was raised four times pre-trial as soon as I realized it could be an issue. And at that time, the state of the law was in its very infancy. There was no district court case out there that supported my position. The circuit court case that it checked in was Range, which was the three-judge panel case. It was before the en banc decision, so I didn't even have that at the time. After months later, after post-trial motions have been filed, I addressed it with the court again when I did have federal support. And that is good cause. And the judge seemingly agreed. She said this is going to be an important issue for this appeal. My colleague across the bar mentioned Rahimi and how Rahimi has adopted the presumptively lawful language. I don't really read Rahimi as stretching to 922G. In Rahimi, one of the focuses of the court was the fact that it was just a temporary prohibition. Right, it's clearly distinguishable. All the cases are clearly distinguishable. It's a long way to go. It's a long way to go. And that was a DV case on the underlying offense. All true. There are ways in which Rahimi does support our position. And one of them is its emphasis on the temporary nature, whereas 922G1, as we know, is a permanent prohibition. Both sides will have an opportunity to give us their views on the recent case law around the Bruin issue. We assure you of that. I'm sorry. I find the issue irresistible, Your Honor. And then finally, my colleague across the bar mentioned there was no medical evidence in the record about my client's condition. And that's not true. There was an exhibit that was submitted to the court, the district court, that outlined that he was admitted due to acute pain and severe sickle cell anemia. And it was not contested at all. But he remained in the hospital for three weeks. And I don't think anyone thinks that hospitals keep people in the hospital longer than they need to be. So, with that, I submit. Thank you, counsel. Well argued by both sides. We will reserve decision on the case. Thank you. Thank you.